United States District Court
Southern District of Texas
**ENTERED**
September 08, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ORACLE ELEVATOR HOLDCO, INC., | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:19-CV-4658 |
| | § | |
| EXODUS SOLUTIONS, LLC, *et al*, | § | |
| | § | |
| Defendants. | § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On July 6 and 7, 2021, the Court held a bench trial on Plaintiff's claims. After Plaintiff rested, Defendants moved for a directed verdict. In a bench trial, such a motion is treated as a Motion for Judgment on Partial Findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure. After considering the record evidence, parties' arguments, trial testimony, and exhibits, the Court determines that it must **GRANT IN PART** and **DENY IN PART** Defendant's motion. The Court submits the following Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.[1]

## I.    BACKGROUND

This is a business dispute between two elevator companies and various employees. Plaintiff Oracle Elevator Holdco, Inc. ("Plaintiff" or "Oracle") filed the present suit in November 2019 against numerous Defendants, asserting claims for breach of fiduciary duty; knowing participation in, as well as aiding and abetting, a breach of fiduciary duty; civil conspiracy; misappropriation of trade secrets under common law, the Defend Trade Secrets Act ("DTSA"),

---

[1]To the extent any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law; and to the extent any Conclusion of Law reflects a factual finding, it shall to that extent be deemed a Finding of Fact.

and the Texas Uniform Trade Secrets Act ("TUTSA"); tortious interference with contractual relations; tortious interference with prospective contracts; fraud; conversion; common law theft; and unjust enrichment.  (Doc. 1 at 3).

In April 2021, Plaintiff moved for partial summary judgment on a number of claims.  (Doc. 49).  The Court held a hearing and denied summary judgment as to all claims at issue.  (Minute Entry 05/13/2021).  In anticipation of trial and with Defendants' consent, Plaintiff amended its Complaint to narrow its claims.  (Doc. 59).  Plaintiff dismissed its claims of common law misappropriation of trade secrets, conversion, and common law theft.  *Id.* Plaintiff also dismissed from the case Defendants Shawn Avella, Jose Chavez, and Shaun Hicks.  *Id.*  The remaining Defendants are David Luxemburg, Sarah Luxemburg, Julia Avella, Exodus Solutions, LLC ("Exodus"), Jose "Alex" Rivera, and Anthony Avella.[2]

The Court heard sworn testimony and received exhibits in its two-day trial.  Oracle rested its case, and Defendants moved for a judgment as a matter of law arguing that Plaintiff failed to show the existence of a trade secret, an independent tort that tortious interference of prospective contracts requires, and the existence of a fiduciary duty.  After listening to the parties' arguments, the Court took Defendants' motion under advisement and Defendants presented their case.  *See* Fed. R. Civ. P. 52(c) (A court may "decline to render any judgment until the close of the evidence.").

## II.   LEGAL STANDARD

A motion for judgment as a matter of law made during a bench trial is treated as a motion for judgment on partial findings under Rule 52(c).  *Miles-Hickman v. David Powers Home, Inc.*,

---

[2]Because many Defendants share last names, the Court will refer to parties by first name or by first and last name for clarity.

613 F. Supp. 2d 872, 879 (S.D. Tex. 2009) (citing *Federal Ins. Co. v. HPSC, Inc.*, 480 F.3d 26, 32 (1st Cir. 2007)).  Rule 52(c) of the Federal Rules of Civil Procedure provides that a court may enter judgment after a party has been "fully heard" on an issue during a nonjury trial.  Fed. R. Civ. P. 52(c).  A judgment on partial findings is appropriate when a claim or defense of the nonmoving party "can be maintained or defeated only with a favorable finding on that issue."  *Id.*

In considering a motion for judgment on partial findings, the court "is not required to draw any inferences in favor of the non-moving party."  *Miles-Hickman*, 613 F. Supp. 2d at 880 (citing *Ritchie v. United States*, 451 F.3d 1019, 1023 (9th Cir. 2006)).  Instead, the court's task is to evaluate all the evidence, resolve any conflicts, assess the witnesses' credibility, and resolve the case on the basis of the preponderance of the evidence.  9C Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2573.1 (3d ed. 2021).

A court entering judgment pursuant to Rule 52(c) must satisfy the requirements of Rule 52(a)(1) by "find[ing] the facts specially and stat[ing] its conclusions of law separately."  Fed. R. Civ. P. 52(c); *Miles-Hickman*, 613 F. Supp. 2d at 880.  In articulating findings of fact, Rule 52(a) "exacts neither punctilious detail nor slavish tracing of the claims issue by issue and witness by witness."  *Cent. Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (quoting *Burma Navigation Corp. v. Reliant Seahorse M/V*, 99 F.3d 652, 656 (5th Cir. 1996)).  The rule is satisfied where the findings present the reviewer with "a clear understanding of the basis for the decision."  *Id.*  In accordance with Rule 52(a), the Court first lays out its findings of fact followed by its conclusions of law.

### III.   FINDINGS OF FACT

1.   Oracle provides elevator services, including maintenance, repair, and modernization, throughout the United States.  Oracle's branch offices that are relevant to this suit are located in Houston, Texas and Shreveport, Louisiana.

2.   Exodus provides the same types of elevator services in the Houston area.  (Tr. 1-80:15-17).[3]  Exodus is owned and operated by Sarah Luxemburg and Julia Avella.  (Tr. 1-80:11-14).  Exodus was previously a construction company, but began providing elevator services in approximately March of 2019.  (Tr. 1-80:15-24; 1-81:20-22).

3.   David Luxemburg began working for Oracle in 2009.  (Tr. at 1-149:24-150:1-4).  Based on the conduct at issue, David Luxemburg was terminated on October 30, 2019, for failing to follow the company's handbook.  (Tr. at 1-149:17-23).

4.   David[4] served as Oracle's general manager for both the Houston branch and the Shreveport branch.  As the general manager, David was responsible for the branch's growth and profits.  (Tr. 2-9:3-7).  This included training and management of personnel, managing customer relationships, and decisions regarding pricing and proposals.  (Tr. at 1-28:16-25).  He would make decisions on and submit proposals to customers on behalf of Oracle.  (*See, e.g.*, Pl. Exhs. 22, 24, 26).  David also had access to information described as Oracle's "growth strategies," although it was not specified what that information entails.  (Tr. 1-42:17-25).

---

[3]The Court will cite to the trial transcript as (Tr. [day]-[page]:[line numbers]).

[4]"David" refers to David Luxemburg unless specifically stated otherwise, such as "David Baucom."

5.  In September 2018, David Baucom ("Baucom"), Oracle's regional vice president at the time, re-assigned David Luxemburg to manage only the Shreveport branch. (Tr. 2-12:9-14). Baucom believed the Houston branch had grown large enough that it was too large a responsibility for one manager to manage and grow both branches adequately. (Tr. 2-12:14-24). Since David Luxemburg was from Louisiana, he was re-assigned to Shreveport. (Tr. 2-12:22-24).

6.  Baucom hired another general manager, Carlos Rosa, for the Houston branch. (Tr. 2-12:23-24; Tr. 1-63:4-7; Doc. 49-25 at ¶ 4 (Simmons Aff.)).

7.  By February of 2019, Baucom re-assigned David Luxemburg as Houston's general manager. (Tr. 2-12:25-13:2). Rosa, the new general manager of Houston, was not growing Oracle's business and was not performing adequately with respect to customer relations and communications. (Tr. 2-13:3-14:2). Various customers complained about delays in work and about a lack of communication from the Houston branch. Many customers also expressed a preference for working with David Luxemburg. As a result, Baucom brought David Luxemburg back as Houston's general manager.

8.  Baucom still intended to hire another general manager for Houston in the long-term, because he believed a general manager solely dedicated to Houston was needed to grow the branch further, but he felt the company could maintain relationships better with David Luxemburg. (Tr. 2-13:24-14:6).

9.  Defendant Jose "Alex" Rivera was hired by Oracle in 2013 and resigned from his service technician position on October 28, 2019. (Simmons Aff. ¶ 5). Alex is the father of Sarah's children and is Shaun Hicks's half-brother. (Pl. Exh. 58 at 18:10-14, 61:15-18 (Sarah Tr.)).

Alex has been an Exodus employee since November 29, 2019, and is currently a supervisor for Exodus. (Doc. 49-28 at No. 15; Tr. 1-88:10-11).

10. Defendant Anthony Avella is Julia Avella's husband. (Pl. Exh. 58 at 15:14-15).  Previously dismissed defendant, Shawn Avella, is Anthony's brother.  Anthony and Shawn are also both sons of Patrick Avella, who is discussed further *infra*. (Pl. Exh. 64 at 11:8-17 (Patrick Tr.)).  Both Anthony and Shawn Avella previously worked for Oracle but resigned from their modernization technician positions on October 28, 2019.  (Simmons Aff. ¶¶ 6-7).  Anthony and Shawn Avella currently work for Exodus as a technician and a helper, respectively.  (Doc. 49-28 at No. 15; Tr. 1-88:20-89:9).

11. Jose Chavez and Shaun Hicks are also previous Oracle employees who resigned from Oracle on October 4, 2019 and August 19, 2019, respectively.  (Simmons Aff. ¶¶ 8-9).  Chavez has worked for Exodus since October 7, 2019, and Hicks briefly worked for Oracle in May and June of 2020.  (Doc. 49-28 at No. 15; Tr. 1-89:16-23, 88:12-17).

12. Boxer Property Management Corporation ("Boxer") is a property management company and one of Oracle's former customers for elevator services.  (Pl. Exhs. 3-8; Tr. 2-46:4-24).  There is no longer a relationship between Boxer and Oracle.  However, all of the projects at issue are projects for Boxer.

13. Patrick Avella, the father of Anthony and Shawn Avella, is a chief engineer consultant at Boxer, which is akin to a project manager, and includes managing any major projects at properties managed by Boxer.  (Tr. 2-46:8-12).  Patrick was a primary point of contact on behalf of Boxer with Oracle at the relevant time, including the general managers (David Luxemburg and Carlos Rosa) and the regional vice president (David Baucom).

**David Luxemburg and Sarah Luxemburg's Central Conduct**

14. The conduct at issue centers on six emails David Luxemburg sent to Sarah Luxemburg in June 2019.

15. The emails contained three of Oracle's proposals created for Boxer projects that were actively out for bidding; a quote from a third-party vendor, Draka, to Oracle; Oracle's corporate brand standards and contract templates; and a list of jobs that Boxer had cancelled with ThyssenKrupp[5] where David then suggested prices for each job.  (Pl. Exhs. 20, 21, 23, 25, 27, 29).

16. The most critical emails are three proposals that David sent to Sarah on June 6, 2019.  (Pls. Exh. 21, 23, 25).

17. David sent Oracle's 9894 Bissonnet modernization proposal to Sarah at 3:14pm on June 6, 2019.  (Pl. Exh. 25).  Within the same minute, David submitted Oracle's same proposal to Patrick Avella and George Lyman at Boxer. (Pl. Exh. 26).  The proposal was emailed to Sarah and Boxer before Exodus bid on the same job.  David sent the same proposal from Oracle to Sarah again on June 24, 2019. (Pl. Exh. 27).

    a. Exodus submitted a proposal to Boxer for the same Bissonnet job on June 24, 2019. (Pl. Exh. 69).

    b. Exodus' proposed price, at $383,363, was significantly lower than Oracle's proposed price of $525,000.  (Pl. Exhs. 69 at 5, 26 at 11).

    c. In August 2019, Exodus was awarded the 9894 Bissonnet modernization project. (Tr. 1-102:19-23; Pl. Exh. 30 at 1).

---

[5]ThyssenKrupp is not a party to this case and its name is used only to identify the jobs at issue.

18. In September 2019, Patrick informed Oracle that Boxer was cancelling Oracle's service agreements for 9894, 9896, and 9898 Bissonnet, as well as the 13201 Northwest Freeway agreement, effective in thirty days.  (Pl. Exh. 11).

   a. Boxer and Oracle had a "Master Service Agreement" that entitled Boxer to terminate any agreement for "any reason" so long as fifteen days' written notice was given.  (Pl. Exh. 3 at 4).

   b. Boxer has a policy of maintaining one vendor for a type of service at any "campus," meaning any three or more buildings in one location, such as the three Bissonnet locations.  (Tr. 2-72:2-13).  Because Exodus was awarded the modernization project at 9894 Bissonnet, Boxer also awarded the service agreements for the Bissonnet campus to Exodus.

19. Sarah admits she spoke and "consulted" with David Luxemburg about the 9894 Bissonnet project, and could not remember when that was, but it was "most probably" before she submitted Exodus' bid on the project.  (Pl. Exh. 58 at 122:17-123:8, 137:4-10).  Sarah also admitted to "look[ing] over" Oracle's proposals to get "an overview of how theirs is done." (Pl. Exh. 58 at 138:1-7).

20. Julia Avella was not involved in the creation of Exodus' 9894 Bissonnet proposal. (Pl. Exh. 58 at 124:9-11).

21. On June 6, 2019, David Luxemburg also sent Sarah a copy of Oracle's proposal for a Boxer modernization project at 13201 Northwest Freeway.  (Pl. Exh. 21).  David also submitted the proposal to Boxer just one minute later.  (Pl. Exh. 22).  Oracle's proposed price was $418,380. (Pl. Exh. 22 at 11).

    a.  Exodus submitted a proposal for the 13201 Northwest Freeway modernization project, but Exodus' proposed price is unknown. (Pl. Exh. 64 at 58:6-9). Exodus performs maintenance for Boxer at 13201 Northwest Freeway, but has not done any modernization work for Boxer at that location. (Pl. Exh. 60 at 117:11-18; Pl. Exh. 30 at 1).

    b.  The 13201 Northwest Freeway modernization project was never actually performed. (Pl. Exh. 64 at 58:6-13). It is unknown if it was ever awarded to any company.

    c.  13201 Northwest Freeway was not a part of the Bissonnet campus.

    d.  Patrick testified that the 13201 Northwest Freeway service contract (not a modernization) was taken from Oracle because Oracle failed to repair an elevator out of service. (Tr. 2-72:21-25).

22. The third proposal at issue concerns a Boxer modernization project at 7676 Hillmont. As with the two previous projects, David Luxemburg sent Oracle's proposal to Sarah Luxemburg and simultaneously submitted the proposal to Boxer. (Pl. Exhs. 23, 24). Oracle's proposed price was $211,087.50. (Pl. Exh. 24 at 11).

    a.  In November 2019, Patrick Avella solicited a bid from Exodus for the 7676 Hillmont modernization project. (Def. Exh. 17). In doing so, Patrick forwarded Oracle's bid to Sarah. *Id.* As discussed *infra*, using a competitor's proposal to solicit a lower bid is common for Boxer. (Tr. 2-63:17-64:8).

    b.  Exodus also submitted a proposal for the project but its proposed price is unknown. (Tr. 1-102:5-8).

    c.  No modernization project was ever completed at 7676 Hillmont. (Tr. 2-64:23-25).

d. Exodus began providing services for Boxer at the 7676 Hillmont location in September 2019. (Pl. Exh. 30). However, Oracle did not have a prior service agreement with Boxer for 7676 Hillmont. (Pl. Exh. 9).

23. A fourth email sent on June 6, 2019, from David Luxemburg to Sarah included Oracle's corporate brand standards, letterhead, and contract templates. (Pl. Exh. 20).

24. On June 10, 2019, David forwarded a fifth email with a price quotation from Draka, a third-party vendor, to Oracle. (Pl. Exh. 28).

25. Finally, a sixth email was sent by David to Sarah on June 25, 2019. David sent Sarah an email with a list of jobs that Boxer was soliciting bids on after having cancelled the work with ThyssenKrupp due to inadequate performance. (Pl. Exh. 29). David handwrote his suggested prices next to each job. (*Id.*; Tr. 1-160:18-24).

a. That same day, approximately seven hours later, David sent Oracle's proposed prices for those same jobs to Boxer. (Pl. Exh. 10). All of David's proposed prices on behalf of Oracle were higher than the prices he handwrote in the email to Sarah. (Pl. Exh. 10 at 3).

b. Exodus was awarded and currently performs service agreements for all but two of the jobs on that list of twenty-six jobs. (Pl. Exh. 30). Moreover, all twenty-four jobs that Boxer awarded to Exodus was for the exact same price that David handwrote in his email to Sarah. (*See* Pl. Exhs. 29, 30).

26. While David was still Oracle's general manager, he took other actions on behalf of Exodus. On October 22, 2019, eight days before his termination, David requested a quote on behalf of Exodus from a third-party company for the 9894 Bissonnet project. (Pl. Exh. 31). In that email, he represented himself as Exodus' general manager. (Pl. Exh. 31 at 5). On

10

October 30, 2019, the same day his termination was finalized, David represented himself

as the general manager of Exodus to request general liability insurance.  (Pl. Exh. 32).

**Boxer's Bidding Practices**

27. Boxer requires a competitive bidding process of at least three bids for any project over

$5,000.  (Tr. 2-70:20-71:8).

28. For modernization projects, the bids are then sent to a corporate office in Dallas for

approval and selection.  (Tr. 2-76:13-224).

29. Boxer regularly engages in the practice of "shopping" a bid from one competitor to another,

meaning Boxer will share one vendor's bid with another vendor in order to get a lower

price, to determine if the scope of work is the same, or to get the three bids the company

requires. (Tr. 2-82:5-17; Doc. 54-2 at 2). Patrick at Boxer refers to the last practice as

"us[ing]" a competitor to get a bid, with no intention of selecting that competitor, but

leveraging that bid to get a lower price from a vendor they do intend to select.  (Tr. 2-

55:20-56:4).

30. Boxer is price-sensitive and always selects the lowest bid, at least for modernization

projects.  (Tr. 2-69:19-23).  However, Boxer may help a specific vendor achieve the lowest

bid in the bidding process by providing a competitor's bid so that the preferred vendor can

bid the work at a lower price.  (Tr. 2-69:24-70:5).

31. Patrick admitted that this practice of sharing bids from one competitor to another is "not

right" but it happens regularly and is known in the industry.  (Tr. 2-82:14-23).  Patrick also

testified he has never read a proposal that was "confidential."  (Tr. 2-82:24-83:4).

32. Sarah Luxemburg further testified that this practice is common.  (Tr. 1-146:6-25).  Sarah stated that, as owner of Exodus, she knows it happens but that there is nothing she can do to stop it.  (Tr. 1-146:15-147:1).

33. David Baucom also corroborated that he knew Oracle customers would take an Oracle proposal and "shop it around" to other elevator companies.  (Tr. 2-21:7-9).  Baucom is the most impartial witness because he is not related to any party and he no longer works for Plaintiff Oracle.

34. At least one third-party customer, Village at the Woodlands Waterway, also forwarded an Oracle bid to David Luxemburg and Sarah in December 2020 (once David worked for Exodus as the full-time general manager). (Def. Exh. 18).

35. When Paul Belliveau, President of Oracle, was asked if this was industry practice, he gave an equivocal response.  (Tr. 1-46:6-18).  His response seems to suggest he would not, as the employee providing a bid, want to see the bottom-line price of a competitor's proposal, but that it is common to share the "technical" portions of a competitor proposal so that a price for the same work can be given.  (Tr. 1-46:15-18).

36. Jeffrey Eaton, Plaintiff's elevator industry expert, also testified that customers may shop a price to get the best deal (although he emphasized the difference it makes when an employee shares the information).  (Tr. 1-203:5-204:13).

37. Unlike the other witnesses, Belliveau and Eaton are unfamiliar with the specific local market of Houston.

**Boxer's Cancellations With Oracle**

38. Boxer cancelled various contracts with Oracle between January and November 2019, and later cancelled additional contracts in 2020.  (Pl. Exh. 9).

12

39. Boxer and Oracle's agreements allow for termination with thirty-day notice in the case of non-performance. (*See, e.g.*, Pl Exhs. 4 at 6, Tr. at 1-47:3-7). Boxer and Oracle's "Master Service Agreement" further gives Boxer the right to terminate the agreement for "any reason" with fifteen days written notice. (Pl. Ex. 3 at 4).

40. Patrick was not responsible for deciding whether to cancel such contracts, but did relay the information to his superiors to help make that decision. (Tr. 2-75:5-13).

41. Oracle stated that Boxer cancelled its contracts with Oracle due to David's alleged misconduct and assistance to Exodus. Defendants and Boxer stated that the reason Boxer cancelled its contracts with Oracle was due to Oracle's poor performance.

42. As previously noted, Boxer notified Oracle on September 9, 2019, that it was cancelling its service contracts with Oracle for the properties at the Bissonnet campus and at 13201 Northwest Freeway, effective October 9, 2019. (Pl. Exh. 11). That notice was given in an email from Patrick Avella to David Luxemburg and Christi McKay (customer service associate at the Oracle Houston branch). Patrick's email did not provide any reason for the cancellation.

43. In October 2019, Patrick informed Oracle (via email to David Luxemburg and Christi McKay) that it was also terminating the service contract at 10333 Harwin. (Pl. Exh. 12). Patrick again did not provide a reason for the termination in the email. Exodus was awarded the 10333 Harwin service contract in November 2019. (Pl. Exh. 30 at 1).

44. As previously discussed, Patrick admitted that the service agreements for all three Bissonnet locations were cancelled by Boxer after the modernization project was awarded to Exodus because Boxer maintains one vendor per campus.

13

45. Patrick also testified that Boxer was not going to give the 9894 Bissonnet modernization project to Oracle because Oracle had performed too poorly on existing modernization projects and "had already proven that they could not handle their load." (Tr. 2-69:8-18, 70:2-3).

    a. Specifically, Oracle was months behind schedule on a modernization project, and communication had broken down such that Boxer did not know the status of the project. (Tr. 2-69:16-18; Def. Exh. 2 at 1).

    b. Patrick testified that, while Boxer always chooses the lowest bidder, if Oracle had bid lower than Exodus, Patrick would have spoken with Exodus to seek a lower price. (Tr. 1-69:24-70:5).

46. As to service contracts, Patrick also testified that Boxer stopped working with Oracle due to inadequate performance and failed communication. As examples, Oracle failed to repair an elevator and failed to fix the issues necessary to retain a permit from the City of Houston. (Tr. 2-72:21-25, 73:17-74:8). Boxer tenants also complained about Oracle's elevator service and lack of repairs. (Def. Exhs. 4-5). Oracle also had a service technician whose performance was unsatisfactory and garnered enough tenant complaints that Boxer requested he no longer work on any Boxer properties. (Def. Exh. 8).

47. Specifically, as to the jobs that previously belonged to ThyssenKrupp, Patrick testified that ThyssenKrupp was terminated because it was providing poor service. (Tr. 2-59:21-60:3). Boxer then hired Exodus, not Oracle, because Oracle's service had become so terrible. (Tr. 2-60:4-9). While Oracle had provided spectacular work at one point, its service "had failed so poorly" that Boxer "had no choice but to eliminate them" from any jobs. (Tr. 60:24-61:4).

14

48. However, during that same late-2019 timeframe, there are also emails from Patrick to David Luxemburg where Boxer solicited proposals and work from Oracle.  (Def. Exhs. 19, 20, 24).  Patrick testified that, while the relationship had soured, sometimes Boxer will still use a company simply to get a third bid or a bid that can be leveraged for lower prices.  (Tr. 67:17-18).

49. The onset of Boxer's dissatisfaction with Oracle's performance is also disputed.   In December 2018 and January 2019, Patrick Avella expressed serious dissatisfaction with Oracle's management.  (Def. Exhs. 2, 3).  Oracle was severely delayed in a modernization project, having been only 85% done with one out of four elevators the date that the entire project had been scheduled to be complete. (Def. Exh. 2 at 1).

   a. Patrick also expressed frustration at the lack of updates on the project, with Oracle going at least one month between updates. (Def. Exh. 2 at 1, 6).  At this time, Carlos Rosa was general manager of Oracle's Houston branch and thus responsible for managing the project and customer communication.   Patrick's frustration was further evidenced by his decision to copy any other Oracle employees he thought could help.  David Baucom, the regional vice president, had to step in to address the matter. (Def. Exh. 3 at 1).

50. Patrick sent other complaints by email, which occurred later in 2019 once David Luxemburg had reasserted his position as general manager in Houston. (Def. Exhs. 4, 5, 8).

51. Although some issues existed with Boxer before David Luxemburg left Houston's branch in 2018, Boxer became overall dissatisfied with Oracle's performance and communication when David left.

52. In February 2019, David Luxemburg returned to Houston to assist with the project delays and customer relations issues that were happening in Houston.

53. There is no evidence that David failed to assist Oracle in repairing customer relations or in resolving project delays.

**Oracle's Proposals**

54. Oracle's employee handbook prohibits the unauthorized disclosure of "confidential information" acquired during employment, and warns that such disclosure can be the basis for legal action against an employee.[6] (Pl. Exh. 2 at 5-6).  Oracle considers its confidential information as one of its "most valuable assets."  (Pl. Exh. 2 at 6).

55. Confidential information is broadly defined in Oracle's handbook, and includes "product costs" and "pricing." (Pl. Exh. 2 at 6).

56. Oracle's handbook also recognizes that a distinction exists between trade secrets and its internally defined "Confidential Information." (Pl. Exh. 2 at 6).

57. Although the handbook states that an employee may be required to enter into a confidentiality agreement regarding its confidential information, Oracle—at least its Houston branch—did not place any of the relevant employees under any confidentiality or non-disclosure agreements.

58. Numerous Oracle employees, including general managers, customer service associates, and anyone involved in sales, would have access to proposals, help create proposals, and submit them to customers.  (Tr. 2-21:22-22:4).

---

[6]Oracle's handbook does not include a date of issuance, but the parties do not dispute that it was in effect at the relevant time in 2019.

16

59. Oracle also did not have any requirements prohibiting its customers from disclosing bids to third parties.  (Tr. 1-46:2-5).

60. None of the Oracle proposals that David Luxemburg provided to Sarah or submitted to Boxer were designated as confidential or indicated that the proposals should be kept private by the customer.  (*See* Pl Exhs. 10, 22, 24, 25, 26).

61. While Oracle password-protected proposal information internally, it did not password-protect the proposals it sent to customers to hinder disclosure to third-parties.

62. The only reference to "private and confidential" information was a letter from Carlos Rosa to Boxer stating that Oracle's existing service rates with Boxer were private and confidential.  (Def. Exh. 10).  Oracle did not include that language in any other proposal in the record.

63. Oracle's proposals indicated the price and terms, but did not include information as to how Oracle reached that price.  (Tr. 2-23:3-24).

64. Baucom testified that he would consider Oracle's method of calculation somewhat confidential, but not the price itself.  (Tr. 2-21:10-21).

65. The price that Oracle bid for a project that is currently in a bidding process would be valuable information to a competitor because it would allow the competitor to underbid Oracle.

**Other Former Oracle and Current Exodus Employees' Conduct**

66. Sarah Luxemburg knew that David Luxemburg was Oracle's general manager in 2019. Exodus also admitted that Sarah requested information regarding Oracle's proposals to assist her as Exodus entered the elevator business. (Pl. Exh. 17 at No. 34).

67. It can be inferred that Alex Rivera and Anthony Avella also knew David Luxemburg was the general manager because they worked for Oracle.

68. Julia Avella also likely knew David Luxemburg was the general manager of Oracle, as she was Anthony's wife and Sarah's business partner.

69. However, there is no evidence that Julia, Alex, or Anthony knew about or participated in the emails between Sarah and David.

70. There is also no connection between Julia, Alex, or Anthony concerning any discussions Sarah had with David regarding preparing proposals or other elevator-related operations.

71. David, Sarah, and Exodus admitted that Anthony Avella and Alex Rivera "may have" provided unpaid assistance to Exodus before they became Exodus employees. (Pl. Exhs. 17 at Nos. 23-24; Pl. Exh. 18 at Nos. 10-11; Pl. Exh. 49 at Nos. 21-22).

   a. The only evidence in the record connecting Anthony Avella to Exodus before his resignation from Oracle was his request for liability insurance on behalf of Exodus. (*See* Pl. Exhs. 32, 35).

   b. Alex Rivera took an elevator licensing test on behalf of Exodus. (Tr. 1-125:19-24). He also received various emails to an Exodus email account for releases of lien and for payment pertaining to the 9894 Bissonnet job.  (Pl. Exh. 53).  There is no evidence that Alex sent emails from his Exodus email account during this time period.

**Oracle's Investigation**

72. Once Oracle learned about Boxer cancelling its contracts, Paul Belliveau and other Oracle executives questioned David Luxemburg about Exodus and Sarah.  (Tr. 1-30:10-31:4).

David refused to answer questions about Exodus or about his daughter.  They also attempted to question Alex Rivera but he refused to speak with them.  (Tr. 1-31:3-12).

73. Oracle management searched David Luxemburg's emails, and discovered the emails discussed *supra*.  (Tr. 1-30:3-9).

74. As a result of management's investigation, David Luxemburg was terminated on October 30, 2019.  (Tr. 1-36:22-25, 149:17-23).

## IV.   CONCLUSIONS OF LAW

Plaintiff asserts claims against different Defendants, as specified below, for breach of fiduciary duty; knowing participation in, or aiding and abetting, a breach of fiduciary duty; civil conspiracy; misappropriation of trade secrets under the federal Defend Trade Secrets Act ("DTSA") and the Texas Uniform Trade Secrets Act ("TUTSA"); tortious interference with contractual relations; tortious interference with prospective contracts; fraud; and unjust enrichment. The Court issues conclusions of law as to each claim in turn.

### A.  Count[7] I: Breach of Fiduciary Duty against David Luxemburg

To prevail on a breach of fiduciary duty claim under Texas law, a plaintiff must prove that (1) a fiduciary relationship between the plaintiff and defendant, (2) the defendant breached a fiduciary duty to the plaintiff, and (3) the defendant's breach proximately caused injury to the plaintiff or benefit to the defendant.  *Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007) (quoting *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App. 2006)).

---

[7]The correct term is a "claim for relief." Fed. R. Civ. P. 8(a).  However, the Court will use the parties' terminology.

### 1. Existence of a Fiduciary Duty

Oracle argues that David Luxemburg owed a duty to Oracle as the general manager of its Houston branch, or alternatively, by an informal confidential relationship. David Luxemburg contends he owes no fiduciary duty at all.

Texas law recognizes two types of fiduciary relationships. *Wellogix, Inc. v. Accenture, LLP*, 788 F. Supp. 2d 523, 544 (S.D. Tex. 2011) (Ellison, J.). The first, a formal fiduciary relationship, "arises as a matter of law and includes the relationships between attorney and client, principal and agent, partners, and joint venturers." *Id.* (quoting *Navigant*, 508 F.3d at 283). The second, an informal fiduciary relationship, may arise in a moral, social, domestic, or personal relationship where one person trusts and relies on another. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex. 1997).

An employer-employee relationship is a "species of the formal principal-agent relationship." *Salas v. Total Air Servs., LLC*, 550 S.W.3d 683, 690 (Tex. App. 2018) (citing agency law). David Luxemburg is, in small part, correct that an employee "does not owe an *absolute* duty to their employer" and does not become a fiduciary simply by virtue of the employment relationship. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 201 (Tex. 2002) (emphasis added). Nonetheless, "under common-law principles of agency, employees do owe certain limited fiduciary duties." *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 216 (5th Cir. 2018) (citing *Johnson*, 73 S.W.3d at 202). Employees' fiduciary duties include a duty not to compete with their employers and to act primarily for the benefit of the employer in matters connected with their employment. *Id.*; *Salas*, 550 S.W.3d at 690. Employees also owe a duty not to (1) appropriate company trade secrets; (2) solicit the former employer's customers while still working for their employer; (3) solicit the departure of other employees while still working for their employer; or

20

(4) carry away confidential information.  *Salas*, 550 S.W.3d at 690; *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 512 (Tex. App. 2003).

In *Salas*, the defendant argued that he did not owe a duty to his employer.  550 S.W.3d at 691.  It was undisputed that he provided quotations on behalf of his employer, he was able to know what work his employer was bidding on, and he knew the price his company was quoting.  *Id.* at 692.  He did dispute, however, that he was a manager.  *Id.*  Although the outer contours of his job duties were disputed, the court found this evidence sufficient to establish that the defendant owed a fiduciary duty to his employer.  *Id.* at 691-92.  The court noted that the defendant could have disputed the scope of his duties, but he disputed whether he owed a duty *at all*.  *Id.* at 691.

Similarly, here, David Luxemburg incorrectly argues that he owed no fiduciary duty at all.  Like in *Salas*, David had access to proposal information, which included pricing and how that price was calculated.  David also calculated and submitted proposals on behalf of Oracle, thereby acting as Oracle's agent.  This case is stronger than *Salas* because David was, in fact, the general manager of Oracle's Houston branch at the time in question.  Thus, David Luxemburg owed a fiduciary duty to Oracle based on the employer-employee relationship.

Because the Court finds a fiduciary duty exists, it need not address Oracle's alternative argument that an informal relationship existed.  The Court therefore **DENIES** Defendants' motion for directed verdict on this ground.

### 2.  Breach of Fiduciary Duty

David Luxemburg would fare no better if he attempted to dispute the *scope* of his fiduciary duty, like the *Salas* court suggested.  As previously discussed, employees' fiduciary duties are tempered by their right to compete and an interest in encouraging competition.  *Navigant*, 508 F.3d

at 284; *Johnson*, 73 S.W.3d at 201.  An at-will employee may plan to compete with his employer and even take active steps while still employed, including secretly joining with other employees. *Abetter Trucking*, 113 S.W.3d at 510.  "However, there are recognized limitations on the conduct of an employee who plans to compete with his former employer." *Id.* at 512.  As relevant here, this includes not carrying away confidential information, not appropriating trade secrets, and not soliciting his employer's customers.  *Navigant*, 508 F.3d at 284 (quoting *Johnson*, 73 S.W.3d at 202). An employee "may not act for his future at the expense of his employer . . . or by a course of conduct designed to hurt the employer." *Id.*

The evidence as to David Luxemburg's conduct is damning.  The Oracle proposals David sent to Sarah are sufficient to show that David carried away confidential information.  By providing pricing information on a project that was in active bidding, David acted in his interest (even if just to help his daughter) at the expense of Oracle.  Regardless of whether the information was a trade secret or whether David's disclosure was the *cause* of Oracle not being awarded the jobs, David was knowledgeable enough to understand that disclosing a live bid price would disadvantage his employer's competitive position.  David went beyond preparations to compete and disclosed information that he understood would hurt his employer.

David also negotiated a bid with an Exodus subcontractor for the 9894 Bissonnet modernization project and did so by representing himself as Exodus' general manager.  This also went beyond preparing to compete, and shows a breach of David's duty to act in Oracle's best interest because it helped a competitor, Exodus.

David Luxemburg further breached his fiduciary duty when he suggested prices to Sarah (for Exodus) for the jobs previously handled by ThyssenKrupp.  Although an employee is allowed to use his own knowledge in preparing to compete, David simultaneously submitted bids for those

jobs on behalf of Oracle while he suggested lower prices to Sarah.  Sarah was then able to bid the exact prices that David suggested.  David's conduct, taken as a whole, was designed to hurt his employer and thus constituted a breach of his fiduciary duty.

Lastly, Oracle also points to David having secured insurance for Exodus.  Although it was improper to represent himself as Exodus' general manager in doing so, seeking insurance is more of a permissible act in preparation to compete. Because this action is not directly adverse to Oracle's interest, it does not rise to a breach of fiduciary duty.

In sum, David breached his fiduciary duty when he provided the proposals to Sarah, negotiated a subcontractor bid on behalf of Exodus, and suggested prices to Sarah that he knew were lower than what he would bid on behalf of Oracle.

### 3.  Proximate Cause of Alleged Damages

Oracle must also show that David Luxemburg's breach caused an injury to Oracle or benefitted David.  Texas courts have held that causation and actual damages are not required for certain breach of fiduciary duty claims where the plaintiff seeks an equitable remedy of "disgorgement" or "forfeiture."  *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220-21 (Tex. 2017) (discussing precedent).  The reasoning behind this rule is that disgorgement does not represent actual damages to be compensated, but instead acts as a deterrence to protect relationships of trust. *ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 872-73 (Tex. 2010).  A party must plead forfeiture to be entitled to that equitable remedy.  *Lee v. Lee*, 47 S.W.3d 767, 780 (Tex. App. 2001) (citing *Burrow v. Arce*, 997 S.W.2d 229, 246 (Tex. 1999)).  Oracle did not mention forfeiture or disgorgement in its Complaint, but rather seeks compensatory damages for Oracle's losses.  Oracle does not seek to disgorge any compensation

or benefit David Luxemburg obtained.  As such, equitable forfeiture cannot apply and Oracle bears the burden of proving causation and damages.

Breach of a duty proximately causes an injury if the breach is (1) a cause in fact of the harm and (2) the injury was foreseeable.  *Stanfield v. Neubaum*, 494 S.W.3d 90, 97 (Tex. 2016).  Cause in fact requires (1) proof that the conduct was a "substantial factor in bringing about the harm at issue," and (2) "but for" the act, the harm would not have occurred.  *Id.*  If an act "merely creat[es] the condition that makes the harm possible," it is not a substantial factor in causing the harm as a matter of law.  *Id.* (citation omitted).  Foreseeability is established if "a person of ordinary intelligence should have anticipated the danger created by a negligent act or omission."  *Id.* (quoting *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995)).  Although a superseding cause destroys the causal connection between the misconduct and harm, a "concurring cause" simply "concurs with the continuing and co-operating original negligence in working the injury," so the causal connection between the defendant's conduct and the plaintiff's harm remains intact.  *Id.* at 98.

Oracle asserts that David's conduct caused the cancellation of its contracts with Boxer.  Defendants respond that the cancellations were not caused by David Luxemburg's conduct, but rather due to Oracle's poor performance with Boxer.  Although the parties address the harms generally, a specific discussion of the various contracts is necessary.

There are three categories of alleged harms: (1) modernization projects, (2) repair contracts, and (3) maintenance contracts.  Beginning with the modernization projects, Oracle argues that it suffered over $700,000 in lost profits for seven different modernization projects.  Of those seven, David Luxemburg provided Oracle's proposal for three projects.  Of those three, the

24

record shows only one project, the Bissonnet job, where Exodus underbid Oracle and was awarded the job.

The only mention of a proposed price by Exodus for the 13201 Northwest Freeway project is from Oracle's expert witness, Jeffrey Eaton. (Pl. Exh. 57 at 4). However, this portion of Eaton's report is replete with errors. The report appears to transpose Oracle's proposed prices between the Bissonnet and the Northwest Freeway jobs. Further, the report asserts that Exodus proposed a price of $507,321, which would have rendered Exodus' price *higher* than Oracle's proposed price of $418,380. Oracle does not otherwise purport to know what price Exodus proposed for this job. Most critically, this modernization project has not been awarded in over two years since the bidding process occurred. Thus, Oracle has not shown that it suffered any harm related to the Northwest Freeway modernization project. Even if harm had been shown, Oracle did not show that David's conduct related to the job was a substantial factor in bringing about the harm because it is unknown what Exodus proposed after receiving the information David provided.

As to 7676 Hillmont, it is similarly unknown whether Exodus bid on the modernization project and if so, at what price. Even Eaton's report fails to include a proposed price by Exodus. This project has also not been awarded over two years later. Oracle has again failed to show any harm related to this job or that any harm would have been caused by David's conduct.

The four other modernization projects for which Oracle claims lost profits have not been awarded to anyone. Oracle's alleged harm assumes that someday, over two years after bidding, the contracts will be awarded. Additionally, it assumes that if they are awarded, they will not be awarded to Oracle. Lastly, Oracle assumes, without explaining how, that David's conduct would have been a substantial factor in causing this harm two years later.

On the other hand, the record establishes that David provided Oracle's proposal on the Bissonnet project to Sarah.  Sarah, in turn, proposed a lower price on behalf of Exodus.  At the time, Oracle was contracted for maintenance at the Bissonnet campus, which gave it an advantage in the bidding process.  However, Oracle was already far behind on another modernization project with Boxer.  Still, Boxer's practice was to award the job to the lowest bidder and David's conduct allowed Exodus to ensure it underbid Oracle.  Because Boxer awarded the modernization to Exodus, it also cancelled the maintenance agreements and awarded them to Exodus.  Thus, David's breach was a substantial factor in the Bissonnet project being awarded to Exodus, not Oracle, and in Oracle losing the Bissonnet campus maintenance agreements to Exodus.

As for the other maintenance contracts, Oracle has shown that it was underbid on the jobs that were previously ThyssenKrupp's due to David Luxemburg's misconduct.  When David bid certain prices on behalf of Oracle and simultaneously suggested lower prices to Sarah, he ensured that Oracle would be underbid by Exodus.

Oracle also alleges lost profits related to numerous other jobs that were not part of the list of cancelled ThyssenKrupp contracts nor part of the Bissonnet campus.  Oracle fails to show how those jobs, that were either never awarded to Exodus or were cancelled in May 2020, were caused by David's conduct in June 2019.

Defendants challenge causation by pointing to Oracle's poor performance, including a significant delay in another modernization project during the bidding process for the Bissonnet modernization; a communication breakdown after David left the Houston branch; and various customer complaints about elevator service and about one technician.  Patrick Avella explained that, although Boxer took the lowest bidder, it also would go out of its way to ensure that its preferred vendor had the lowest bid.  For example, he stated that he would have asked Exodus to

lower its bid if Oracle had underbid Exodus on the Bissonnet job.  This suggests that Oracle's performance was also a cause of its lost contracts.

Oracle's inadequate performance was also a substantial factor in its purported harm, but there may be more than one cause to a harm.  Although Oracle's performance was a concurring cause, David's misconduct was nevertheless a substantial factor in causing Oracle's lost profits.

As mentioned, Oracle must also show the lost profits were foreseeable to show proximate cause.  Putting aside David's intentions, a person of ordinary intelligence would have reasonably foreseen that Oracle would have been underbid and lost the aforementioned contracts if Oracle's price were shared with its competitor. An ordinary person would also foresee the same fate if that person suggested bid prices knowing that the prices would be lower than the competitor's bids, as in the case of the ThyssenKrupp jobs.

Lastly, Oracle also seeks lost profits related to repair contracts. According to Oracle, the repair contracts would have likely been needed at the maintenance locations and likely would have been awarded to Oracle if Oracle had retained the maintenance agreements.  Even if incumbents have an advantage in securing repair contracts for locations at which they perform maintenance, Boxer also requires competitive bidding for any repair over $5,000 and would select the lowest price.  Further, the expert's figures simply assumes that the repairs would have happened, but we do not know of any specific repairs needed or performed at the locations.  Although such assumptions may be used in valuing a company, the standard here requires Oracle to show *actual* damages that occurred and that the conduct at issue caused those damages.  Given the various assumptions baked into the analysis, the Court finds that Oracle has not met its burden for lost profits related to potential repair contracts.

Oracle has shown that the Bissonnet modernization job, the Bissonnet maintenance agreements, and the maintenance contracts that were previously ThyssenKrupp's but awarded to Exodus, are lost profits proximately caused by David's conduct.  Accordingly, the Court  finds David Luxemburg liable for breach of his fiduciary duty to Oracle.

### B.  Counts II and III: Knowing Participation in a Breach of Fiduciary Duty

Oracle also asserts that Defendants Sarah Luxemburg, Exodus, and Julia Avella knowingly participated in David Luxemburg's breach of fiduciary duty. Under Texas law, there is no distinction between a claim of "knowingly participating in" and "aiding and abetting" a breach of fiduciary duty. While some courts discuss third-party participation in a breach of a fiduciary duty in terms of "aiding and abetting," the Supreme Court of Texas has yet to recognize an independent cause of action for aiding and abetting. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017); *see also AmWins Specialty Auto, Inc. v. Cabral*, 582 S.W.3d 602, 611 (Tex. App. 2019) (declining to adopt aiding and abetting as an independent cause of action).  With this landscape in mind, the Court reviews Counts II and III as one claim for knowingly participating in a breach of fiduciary duty.

"[W]here a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such."  *Meadows v. Hartford Life Ins. Co.*, 492 F.3d 634, 639 (5th Cir. 2007) (quoting *Kinzbach Tool Co. v. Corbett-Wallace Corp.,* 160 S.W.2d 509, 514 (Tex. 1942)).  To establish a claim for knowing participation in a breach of fiduciary duty, a plaintiff must show: (1) the existence of a fiduciary relationship; (2) that the third party knew of the fiduciary relationship; and (3) that the third party was aware that it was participating in the breach of that fiduciary relationship. *Id.* (citing *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 721-22 (Tex. App. 2001).

It has already been established that David Luxemburg owed and breached a fiduciary duty to Oracle. The Court now determines whether Oracle has proven the next two elements as applied to Sarah, Exodus, and Julia.

Texas has a long-standing rule that corporate agents are personally liable for their own tortious or fraudulent acts. *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002) (citing *Leyendecker & Assocs., Inc. v. Wechter*, 683 S.W.2d 369, 375 (Tex. 1984)). A corporate officer who knowingly participates in tortious acts will be held individually liable to third persons, even if the acts were performed as an agent of the corporation. *Walker v. Anderson*, 232 S.W.3d 899, 918 (Tex. App. 2007). It is not necessary to pierce the corporate veil so long as it is shown that the defendant knowingly participated in the wrongdoing. *Id.*; *U.S. Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 221 (Tex. App. 1993); *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 541 (Tex. App. 1989). Further, a corporation can be held liable for the torts committed by its agents or employees while acting in the course and scope of their employment. *Guilbeau v. Anderson*, 841 S.W.2d 517, 519 (Tex. App. 1992) (citing *Allied Chemical Co. v. DeHaven*, 824 S.W.2d 257, 265 (Tex. App. 1992).

On the other hand, if the corporate officers did not participate in the wrongful act, nor had knowledge of it, they are not liable for their corporation or co-officer's conduct. *Permian Petroleum Co. v. Barrow*, 484 S.W.2d 631, 634 (Tex. App. 1972) (citation omitted). The liability of officers is premised on their participation in the wrongdoing, not on their position itself. *Id.*

### 1. Sarah Luxemburg

Sarah Luxemburg admitted that she knew her father, David, was the general manager of Oracle at the time in question. Particularly given her experience in the elevator industry, she knew what duties her father had in that position. Sarah also knew she was participating in David's breach

29

because she was the recipient of the emails he sent.  Sarah and David discussed the Bissonnet project, as well as pricing more generally.  Thus, Sarah is liable as a joint tortfeasor for knowingly participating in David's breach of fiduciary duty.  Although she was a corporate officer of Exodus, she is individually liable because of her knowing participation in David's tortious conduct.

### 2.  Exodus

In order to find Exodus liable for Sarah's participation as Exodus' corporate officer, Sarah's knowledge must be imputed onto Exodus.  Under Texas law, the knowledge of the agent is the knowledge of the principal unless the knowledge was obtained confidentially.  *Floyd v. Hefner*, 556 F. Supp. 2d 617, 655 (S.D. Tex. 2008) (citing *Fireman's Fund Indem. Co. v. Boyle Gen. Tire Co.*, 392 SX.W.2d 352, 356 (Tex. 1965)).  Sarah is a corporate officer of Exodus, and as such, her knowledge is imputed onto Exodus as the principal.  Thus, Exodus is also jointly and severally liable for participating in the breach of fiduciary duty.

### 3.  Julia Avella

As for Julia, the Court can infer she knew David was Oracle's general manager because of her husband's employment with Oracle and her business relationship with her co-owner, Sarah.  Even so, Oracle must show that Julia was aware that David sent the emails to Sarah and that Sarah relied on the emails for Exodus' proposals.  Oracle failed to show any connection between Julia and the conduct in question.  Therefore, Julia Avella is not liable for knowingly participating in David's breach of fiduciary duty.

### C.  Count IV: Civil Conspiracy

Oracle further accuses Sarah Luxemburg, Julia Avella, Exodus, David Luxemburg, Jose "Alex" Rivera, and Anthony Avella of civil conspiracy.  The elements of civil conspiracy are: "(1)

two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *D'Onofrio*, 888 F.3d 197 at 215 (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). Conspiracy is a derivative tort, such that a defendant's liability for conspiracy "depends on participation in some underlying tort." *Id.* (quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)). Oracle relies on David's breach of fiduciary duty as the underlying tort.

### 1. David Luxemburg, Sarah Luxemburg, and Exodus

David and Sarah Luxemburg are the core players in the purported conspiracy. As already established, David and Sarah discussed pricing for at least the Bissonnet job. Although Sarah and David state that David sent the proposals simply for illustrative purposes as to how to complete a proposal, that narrative is undercut by the fact that David sent Sarah proposals for jobs that were currently in the bidding process. David could have easily sent a proposal for a job that was no longer in the bidding stage. Thus, the Court finds that David and Sarah had a meeting of the minds on the plan for David to send Sarah the Oracle proposals in breach of his fiduciary duty. Additionally, Sarah operates Exodus' proposal processes and email accounts. Consequently, Sarah and David must have coordinated on the plan for David to communicate with the subcontractor for the Bissonnet modernization through an Exodus email account and as Exodus' general manager.

David committed an unlawful and overt act when he sent the emails to Sarah and to the Bissonnet subcontractor, in contravention of his fiduciary duties. Lastly, David and Sarah's conduct proximately caused damages, as established *supra*, as part of the breach of fiduciary duty claim. Because Sarah was acting in the course of her employment and operation of Exodus, Exodus is also liable for her wrongdoing in that capacity. *See Guilbeau*, 841 S.W.2d at 519.

31

Although David, Sarah, and Exodus are also liable for conspiracy, Oracle is not entitled to additional recovery for the same injury. *See Tompkins v. Cyr*, 202 F.3d 770, 785 (5th Cir. 2000) (citing *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991)) (plaintiff cannot obtain more than one recovery for the same injury under Texas law "one satisfaction rule").

### 2.  Anthony Avella, Julia Avella, and Alex Rivera

In contrast to Sarah and David, Defendants Anthony, Julia, and Alex played peripheral roles in the relevant operations. Civil conspiracy requires a specific intent to agree to accomplish something unlawful or something lawful by unlawful means. *Parker*, 514 S.W.3d at 222. Parties to a civil conspiracy must be aware of the harm or wrongful conduct at the outset of the combination or agreement. *Id.*

The record lacks any evidence showing that Anthony, Julia, and Alex were aware of Sarah and David's conduct and, much less, that they were aware of David and Sarah's plan at the outset of their discussions. Because Oracle has failed to show a meeting of the minds, or any awareness of the underlying conduct, Anthony, Julia, and Alex are not liable for civil conspiracy.

### D.  Count V and VI: Misappropriation of Trade Secrets under DTSA and TUTSA

The federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act prohibit unlawful misappropriation of trade secrets. *See* 18 U.S.C. §§ 1836(b), 1838; Tex. Civ. Prac. & Rem. Code § 134A.002. A trade secret misappropriation claim requires showing (1) the existence of a trade secret; (2) a breach of a confidential relationship or improper discovery of the trade secret; (3) use of the trade secret, and (4) damages. *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 273 (5th Cir. 2009); *StoneCoat of Texas, LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 340 (E.D. Tex. 2019) (citing similar elements for DTSA and noting similarities). Oracle fails on the first prong, so the Court does not reach the remaining elements.

A "trade secret," as defined under the TUTSA and DTSA, includes "all forms and types of information," including business or financial data where (1) the owner took "reasonable measures under the circumstances to keep the information secret," and (2) the information "derives independent economic value from not being generally known to and readily ascertainable by a person who can gain economic value from the information."  Tex. Civ. Prac. & Rem. Code § 134A.002(6); *see also* 18 U.S.C. § 1839(3).

Oracle claims its "pricing information" is a trade secret.  David Luxemburg sent Sarah emails containing (1) Oracle's proposals for Boxer jobs; (2) various jobs Boxer cancelled with ThyssenKrupp with prices handwritten by David; (3) Oracle's corporate brand standards and contract templates; and (4) a quote from a third-party vendor. The brand standards and contract templates are not pricing information.  The quote from the third-party vendor, Draka, is not Oracle's trade secret because it is Draka's pricing information.  Draka is not a party in this suit complaining of such disclosure.  As to David's handwritten prices for the formerly ThyssenKrupp jobs, the handwritten prices themselves are not Oracle's information such that they could be considered its trade secrets.  Surely, David conduct was improper, as discussed *supra*, but Oracle cannot assert secrecy over those prices.  This leaves us with the three Oracle proposals.

Oracle incorrectly characterizes its pricing information at issue as a "customer list."  The information at issue consists of bids from Oracle to Boxer, one of its customers.  The only piece of information that resembled a customer list was the list of ThyssenKrupp's jobs.  Those jobs, however, did not belong to Oracle and thus cannot be its customer list.

Even if the proposals were characterized as a (quite short) customer list of one, Oracle does not purport that it attempted to keep secret the fact that Boxer was its customer.  Oracle also does not allege that the name of one customer provided Oracle an economic advantage over others, or

that it was not readily ascertainable by independent means. It was the prices that Oracle bid, not Boxer's name, that Oracle argues it took measures to protect. Further, it was Oracle's prices, and not the fact that Boxer was the customer, that could provide a competitor an advantage. Thus, the nature of the information at issue is not properly construed as a "customer list," but rather as pricing information.[8]

The existence of a trade secret is a question of fact. *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 150 (5th Cir. 2004). To determine if a trade secret exists, courts consider six relevant but non-exhaustive factors: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003); *cf. Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) (discussing similar factors to determine if a customer list is a trade secret).

For the first factor, Boxer regularly engaged in sharing bids from one company to another competitor as leverage to secure a lower bid. Although this practice may not have been considered "right," that is beside the point. The inquiry here asks what, in fact, was occurring. Oracle was aware that this practice occurred, as corroborated by Baucom. The Court finds Baucom credible, including as to this fact, given his lack of personal involvement as compared to the other witnesses. On the other hand, the only disclosures the Court is aware of were limited to one other competitor

---

[8]However, caselaw regarding customer lists is still instructive guidance in the Court's determination of whether Oracle's proposals were a trade secret.

and were far from a public disclosure.  The Court finds this first factor to be either neutral or weigh slightly against Oracle when combined with the third factor, the lack of measures taken to guard against this practice.

Turning to factor two, the Court must consider the extent that Oracle's employees and others involved in its business know pricing information.  Almost all Oracle employees have access to pricing information and proposals, including clerical, sales, and management employees. Technicians seem to be the only employees who do not have access to proposals in Oracle's computer system.  This is in contrast to information that a company may only give access to a select few of its employees.  Thus, this factor cuts against Oracle and suggests the pricing information is not a trade secret.

For factor three, the Court considers the extent of measures taken by Oracle to guard the secrecy of the pricing information.  Oracle touts two measures to protect the confidentiality of proposals. First, Oracle's employee handbook defined pricing information as confidential information and prohibited employees' disclosure of any confidential information.  Second, Oracle had passwords on its computer, although many employees had the ability to access that password-protected information.  There are various measures that Oracle could have taken but failed to take. Oracle did not mark its proposals as confidential or secret.  Oracle did not require its potential customers to agree not to disclose proposals to third-parties.  Although Oracle knew about password protection technology, it did not protect its proposal documents with passwords to hinder disclosure and indicate to customers that it considered the information private.  Oracle also did not require non-disclosure or confidentiality agreements with its employees.  Oracle did not take any additional measures even after it was aware that Boxer, one of its regular customers, was sharing proposals with competitors.

Taken as a whole, the measures taken by Oracle to guard the information as secret were extremely limited and amounted to a formality.  The password protection is standard practice for any computer in nearly any business and hardly indicates protection of a secret. The Court finds such limited measures to cut heavily against Oracle.

The fourth factor looks to the value of the information to Oracle and to its competitors.  The price itself does not provide independent economic value to Oracle. It is unlike, say, a modification process for a furnace where the information is of value to the secret holder.  *See Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1195 (5th Cir. 1986).  However, there is significant value in learning a competitor's proposal price.  If a proposal price is disclosed to a competitor, it gives the competitor an advantage in the bidding process such that it can ensure a successful bid.  This is particularly salient, here, because Boxer is price-sensitive.  Therefore, this factor weighs strongly in favor of Oracle.

As to the fifth factor, Oracle did not provide any evidence indicating the labor time or money expended to create a proposal price.  Belliveau, CEO of Oracle, described it as "quite simple."  (Tr. 1-40:11-12).  This factor weighs heavily against Oracle.

The sixth and final factor asks the ease or difficulty with which the information can be "*properly* acquired or duplicated by others." *In re Bass*, 113 S.W.3d 735, 739 (Tex. 2003) (emphasis added).  The inclusion of "properly" is significant.  Although customers would sometimes disclose a competitor's proposal price, Patrick admitted that it was not proper.  Numerous witnesses acknowledged that the practice occurred, but no witness endorsed it as proper.  There does not appear to be another way in which a competitor like Exodus could have properly acquired Oracle's proposed price in a live bid.

Even when information is readily ascertainable, Texas courts have found the information to be protected if it was acquired by a competitor while working for their employer.  *See, e.g.*, *Alliantgroup, L.P. v. Feingold*, 803 F. Supp. 2d 610, 626 (S.D. Tex. 2011) ("Even if the information is readily available in the industry, it will be protected if the competitor obtained it working for the former employer."). In this case, the information was improperly acquired by David in breach of his fiduciary duty. The only other way the information seems ascertainable is through improper bidding practices.  Therefore, this factor weighs heavily in favor of Oracle.

In sum, the value of the information to competitors and the fact that the information cannot be properly acquired by others weighs in favor of the proposal pricing information constituting a trade secret.  On the other hand, the limited security measures taken to guard the secrecy of the information, the accessibility of the information across nearly all Oracle personnel, and the fact that considerable time or expense is not necessary to create a proposal price, all strongly indicate the information is not a trade secret.  Further, the disclosures made by Oracle's customers also slightly weigh against the finding of a trade secret.

Upon balancing the factors and evidence, the Court concludes that the pricing information is not a trade secret.  Oracle surely stood to lose advantage in the market if its competitors knew the price it was bidding, but the record also shows that Oracle did little to avoid that from occurring. Additionally, although this information is not readily accessible by others outside Oracle, that is true for a lot of confidential information within a business.  Information may be confidential while also not rising to the level of a trade secret.

The character of information in trade secrets caselaw is more sophisticated and indicates a considerable expense and effort undertaken to develop the information.  *See, e.g.*, *Metallurgical*, 790 F.2d at 1195 (modifications to zinc furnace and recovery process), *Taco Cabana Int'l, Inc. v.*

*Two Pesos, Inc.*, 932 F.2d 1113, 1124 (5th Cir. 1991) (architectural plans and kitchen design), *Snowhite Textile & Furnishings, Inc. v. Innvision Hosp., Inc.*, No. 05-18-01447-CV, 2020 WL 7332677, at *6-7 (Tex. App. Dec. 14, 2020) (proposal pricing, design plans, mood boards, a pricing spreadsheet, and additional information), *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, No. A-14-CA-00847-SS, 2016 WL 900577, at *2, 4 (W.D. Tex. Mar. 2, 2016) (customer list where great difficulty and expense were taken to compile the contact information and broker rates). Oracle's purported trade secret, on the other hand, is simply a number that is developed by anyone in their sales force and without much labor.  Oracle does not even assert a trade secret in any algorithm or formula that it used to reach that price, likely because that information is not in the final proposal given to customers.

Oracle points the Court to Fifth Circuit caselaw on limited disclosures. *See Taco Cabana*, 932 F.2d at 1124 ("If a voluntary disclosure occurs in a context that would not ordinarily occasion public exposure, and in a manner that does not carelessly exceed the imperatives of a beneficial transaction, then the disclosure is properly limited and the requisite secrecy retained.") (citing *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1201 (5th Cir. 1986)).  In *Metallurgical*, the plaintiff contracted with one of the defendants to construct a zinc furnace for Metallurgical. 790 F.2d at 1197.  Metallurgical was dissatisfied with the furnace the defendant created, so it made several modifications in order to improve its performance.  *Id.*  Later, the defendants were contracted by another company to build a furnace, and they incorporated the modifications that Metallurgical had previously made.  *Id.*  at 1198. Metallurgical sued for misappropriation of trade secrets, arguing that the process of the various modifications formed a trade secret.  *Id.*

As in this case, the defendants argued that the plaintiff's disclosure of its trade secret to other parties vitiated the secrecy, but the Fifth Circuit disagreed. *Id.* at 1200.  The court distilled

two reasons why Metallurgical's "limited" disclosure to others did not extinguish the information's secrecy: (1) "the disclosures were not public announcements"; and (2) the disclosures were made for their own economic benefit. *Id.*

At the outset, the disclosures by Oracle to customers like Boxer are not grounds for vitiating secrecy because such disclosures are necessary for a business to operate and were clearly done for profit.[9] In *Metallurgical*, the Fifth Circuit was conducting a review of the evidence with inferences made in the plaintiff's favor. 790 F.2d at 1198. It had already concluded that a reasonable jury could conclude the furnace modification information was a trade secret *before* it turned to the issue of disclosure. *Id.* at 1200. Here, the Court "is not required to draw any inferences in favor of the non-moving party."[10] *Miles-Hickman*, 613 F. Supp. 2d at 880. The Court has already concluded that the proposal price is *not* a trade secret when considering the factors and evidence. Put differently, the *Metallurgical* court considered whether a limited disclosure vitiated the secrecy of the information. Here, there is no secrecy to vitiate.

The *Metallurgical* court also relied on the plaintiff's security measures to conclude the information was a trade secret. 790 F.2d at 1199. The plaintiff's information was concealed from all but "authorized" personnel, the area had signs warning about restricted access, and the company policy required all authorized personnel to sign a non-disclosure agreement. *Id.* Although Oracle attempted to emphasize its security measures, nearly all employees could access the information and Oracle did not bother to require non-disclosure agreements.

---

[9]On the other hand, the measures taken to protect its secrecy when submitting proposal prices are relevant and are discussed *supra*.

[10]Oracle is the non-moving party to Defendants' Motion.

The Fifth Circuit has also suggested that, once a plaintiff makes a prima facie case for the existence of a trade secret, it is the defendant's burden to show that a disclosure destroys any secrecy to the information.  *See Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 875 (5th Cir. 2013) (citing *Injection Research Specialists, Inc. v. Polaris, L.P.*, Nos. 97-1516, 97-1545 & 97-1557, 1998 WL 536585, at *8-9 (Fed. Cir. Aug. 13, 1998)) (upholding jury finding of a trade secret)).  Oracle has not made its prima facie case, so the issue of disclosure is not dispositive.

For these reasons, the Court finds that the pricing information is not a trade secret, and **GRANTS** Defendants' Motion as to the two trade secrets claims.

### E.   Count VII: Tortious Interference with Contractual Relations

Oracle mounts a claim for tortious interference with its Boxer contracts against all Defendants.  A claim for tortious interference with a contract requires showing (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) the interference caused damage; and (4) actual damage or loss occurred. *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 588 (Tex. 2017) (citing *ACS Inv'rs, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).  "For a plaintiff to maintain a tortious interference claim, it must produce some evidence that the defendant knowingly induced one of the contracting parties to breach its obligations under a contract." *Cuba v. Pylant*, 814 F.3d 701, 717 (5th Cir. 2016) (quoting *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App. 2009)).

The parties do not dispute that Oracle previously held contracts with Boxer.  While Oracle failed to specify which contracts, the Court has identified the contracts at issue as three Bissonnet service agreements, the 13201 Northwest Freeway service agreement, and the 10333 Harwin service agreement.

40

However, merely "inducing a contract obligor to do what it has a right to do is not actionable interference." *New York Life Ins. Co. v. Miller*, 114 S.W.3d 114, 125 (Tex. App. 2003) (citing *McLaughlin*, 943 S.W.2d at 431).  Oracle's contracts allow for termination with thirty-day notice in the case of non-performance.  Boxer and Oracle's Master Service Agreement further gives Boxer the right to terminate the agreement for "any reason" with fifteen (15) days written notice.  It is telling that nowhere in Oracle's pleadings or arguments does it allege that Boxer's cancellations constituted a breach of contract.  The Northwest Freeway contract was terminated due to Oracle's failure to repair an elevator out of service. As for the Harwin contract, Boxer cancelled the contract with thirty days' written notice.  Although Boxer did not provide a reason, it was entitled to cancel for any reason.  The three service agreements for the Bissonnet campus were also cancelled with thirty days' written notice.  Thus, Boxer's cancellations could not have been tortious interference on behalf of the Defendants because Boxer was merely enforcing its right to terminate the contract.

In the case of the other Defendants, Oracle has not shown any action by Julia, Alex, or Anthony as it relates to the agreements with Boxer.  The record does not even establish that these three Defendants were aware of these service agreements in particular.  Therefore, Oracle has failed to establish its claim against all Defendants.

### F.  Count VIII: Tortious Interference with Prospective Contracts

Oracle similarly asserts a claim for tortious interference with *prospective* contracts against all Defendants.  Oracle must prove that, (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was

41

independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 750 (5th Cir. 2019) (citing *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909 (Tex. 2013)).

Because Julia, Alex, and Anthony did not act tortiously or unlawfully, as discussed *supra*, they are not liable for tortious interference with prospective contracts.  The conduct of David Luxemburg, Sarah Luxemburg, and Exodus, however, has been established as independently tortious.  As with damages for breach of fiduciary duty, it is necessary to discuss the categories of alleged damages separately.

As for the 9894 Bissonnet modernization, the Court has already found that David and Sarah's conduct caused Oracle to be underbid by Exodus.  David and Sarah both knew enough about competitive bidding in the relevant industries to understand the likely consequences of their conduct.  The remaining inquiry is whether it was "reasonably probable" that Oracle would have otherwise been awarded the project.

Oracle had three existing service agreements at the Bissonnet campus, and various witnesses testified that having a prior agreement for service can give a company an advantage when bidding a modernization or repair project.  The service agreements with the Bissonnet campus began in March 2018 and were only in the second year of a three-year term.  On the other hand, Oracle was significantly behind on another modernization project for Boxer.  Boxer could have reasonably thought that Oracle may have had the resources to execute the service agreements, but likely lacked the labor and resources to properly complete a modernization project at that time.  Therefore, the Court finds that, despite the existing relationship, it was not reasonably probable that Oracle would have received the 9894 Bissonnet project.

42

The Court turns next to the service jobs that were cancelled with ThyssenKrupp.  Although the Court has found that David and Sarah's conduct with respect to bidding these jobs was causally connected to Oracle's harm, there was not a reasonable probability that Oracle would have received those jobs.  Oracle did not point to any existing relationship at the relevant properties.  Oracle also had received various complaints about its services at other Boxer properties.  Boxer's cancellation with ThyssenKrupp is further evidence that Boxer was willing to cancel contracts if the vendor's performance was not up to par.

As for the other modernization projects, service agreements, and repair projects, the Court has already found David and Sarah's conduct did not proximately cause Oracle's failure to receive those projects. For the same reasons regarding Oracle's inadequate performance, Oracle also did not prove it would have been reasonably probable to receive those jobs.

To summarize, Oracle's claim for tortious interference with prospective contracts must be dismissed for failure to prove reasonable probability.  Oracle also failed to show proximate cause for the projects other than the Bissonnet modernization and the jobs that previously belonged to ThyssenKrupp.  Accordingly, Defendants' Motion as to this claim is **GRANTED**.

### G.  Count IX: Fraud (against David Luxemburg)

Oracle also claims David Luxemburg committed fraud by failing to disclose his conduct in the interest of Oracle's competitor, Exodus.  Oracle seeks exemplary damages based on the alleged fraud.  Exemplary damages are awarded as a penalty or punishment, not for compensatory purposes. Tex. Civ. Prac. & Rem. Code § 41.001(5).  Under Texas law, exemplary damages may be awarded "only if the claimant proves by clear and convincing evidence that the harm . . . results from: (1) fraud; (2) malice; or (3) gross negligence." *Id.* at § 41.003(a).  The determination of whether to award exemplary damages falls within the discretion of the trier of fact. *Id.* at §

41.010(b).   The Texas Civil Practice and Remedies Code also suggests that exemplary damages may be awarded only with a unanimous jury verdict. *See id.* at § 41.003(d).

In any case, the Court does not find the conduct at issue to justify penalty or punishment with exemplary damages.  The existing award of actual damages is sufficient both to compensate Oracle and deter future wrongdoing.  As a result, only compensatory damages are at issue.

Oracle's fraud claim is based on the same underlying conduct as the previous claims, including the breach of fiduciary duty claim that it has already established.  As previously referenced, plaintiff cannot obtain more than one recovery for the same injury. *Tompkins*, 202 F.3d at 785.  This "one satisfaction" rule applies "when the defendants commit the same act as well as when defendants commit technically differing acts which result in a single injury." *Sky View at Las Palmas, LLC v. Mendez*, 555 S.W.3d 101, 107 (Tex. 2018).  The fact that there is more than one theory of liability does not change this rule. *Stewart Title*, 822 S.W.2d at 8.  Oracle is not entitled to additional recovery for the same injury (the lost contracts with Boxer). As such, the Court does not reach the fraud claim.

### H.  Count X: Unjust Enrichment (against Exodus)

Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain, such that the person ought to make restitution. *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App. 2013).[11]  A person is unjustly enriched when he obtains a benefit from another by fraud, duress, or the taking of an undue advantage. *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex.1992).

---

[11]While some courts have held that unjust enrichment is not an independent cause of action, the Texas Supreme Court has repeatedly recognized and affirmed claims of unjust enrichment. *E.g.*, *Trial v. Dragon*, 593 S.W.3d 313, 323 n.6 (Tex. 2019) (referring to unjust enrichment and money had and received as distinct claims), *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 891 (Tex. 1998) (recognizing unjust enrichment claim).

However, unjust enrichment is not a remedy "merely because it might appear expedient or generally fair that some recompense be afforded for an unfortunate loss," or "because the benefits to the person sought to be charged amount to a windfall." *Id.* at 42 (internal citation and quotations omitted).

Oracle asserts that Exodus wrongfully secured the benefit of the contracts with Boxer because it did so by soliciting David's assistance.  In *Villareal v. Grant Geophysical, Inc.*, a plaintiff filed claims for trespass, assumpsit, and unjust enrichment. 136 S.W.3d 265, 267 (Tex. App.—San Antonio 2004).   The Texas Court of Appeals held that the defendants had not wrongfully secured a benefit because their conduct did not amount to trespass under Texas law. *Id.* at 270.  Exodus did, in fact, wrongfully secure the benefit of various contracts.  Exodus' conduct, through Sarah, amounted to knowing participation in David Luxemburg's breach of fiduciary duty and civil conspiracy.   However, any damages recoverable under the unjust enrichment theory are limited to the previously established damages.  *See Stewart Title*, 822 S.W.2d at 7-8.

## V.    REMEDIES

Plaintiff Oracle primarily seeks compensatory damages for lost profits. As previously discussed, the Court awards damages relating to (1) the 9894 Bissonnet modernization project, (2) the three service agreements for the Bissonnet campus, and (3) the service jobs that were previously ThyssenKrupp's and are now performed by Exodus.   For the 9894 Bissonnet modernization project, the Court awards $157,500 based on the expected profit margin that Oracle would have received at its quoted price.  (*See* Pl. Exh. 57 at 4).   For the Bissonnet service agreements, the Court awards $8,426.88 based on the profit margin that Oracle would have received over twelve months of service and in accordance with Oracle's expert testimony.  (*See*

Pl. Exh. 57 at 3). Lastly, the Court awards $21,555.28 in lost profits for the jobs that were cancelled with ThyssenKrupp and then awarded to Exodus. (*See* Pl. Exh. 57 at 3). In total, Defendants David Luxemburg, Sarah Luxemburg, and Exodus are jointly and severally liable for $187,842.16. As previously discussed, the Court finds that exemplary damages are not justified in this case.

Oracle also seeks permanent injunctive relief. The precise injunctive relief Oracle seeks, and on what basis, has been elusive. Across their pleadings and filings, Oracle has asked for different injunctive relief. In its Amended Complaint, Oracle asked to enjoin David Luxemburg from breaching his fiduciary duty to Oracle, enjoin all Defendants from using or disclosing any confidential information belonging to Oracle, and require Defendants to return to Oracle all records and other property pertaining to Oracle. (*See* Doc. 59). In its Proposed Findings of Fact and Conclusions of Law, Oracle asked, for the first time and without citation, to enjoin Defendants from performing any future work for Boxer, entering into additional contracts with Boxer, or deriving any future economic benefit from Boxer. (Doc. 61 at 25).

To be entitled to a permanent injunction, Oracle had to plead and prove: (1) a wrongful act; (2) imminent harm; (3) irreparable injury; and (4) no adequate remedy at law. *Jordan v. Landry's Seafood Rest., Inc.*, 89 S.W.3d 737, 742 (Tex. App. 2002) (citing *Morris v. Collins*, 881 S.W.2d 138, 140 (Tex. App. 1994)). The apprehension or fear of injury is insufficient; neither is speculative or conjectural injury. *Id.* (citations omitted). The decision whether to grant injunctive relief is within the sound discretion of the trial court. *Id.* (citing *Crain v. Unauthorized Practice of Law Comm.*, 11 S.W.3d 328, 332 (Tex. App. 1999)).

While Oracle conclusorily pled the elements of injunctive relief, no such evidence was shown at trial. Any injunctive relief sought pertaining to the claims that were not proven is, of course, unwarranted. For the claims Oracle did prove, it did not show any potential future harm

that could occur based on the outdated proposals David sent to Sarah in 2019.  Oracle also failed to show any injury, even speculative, that could not be remedied with money damages. Injunctive relief is improper and must be denied.

## VI.  CONCLUSION

The Court finds that Oracle has not proven any of its claims against Defendants Julia Avella, Jose "Alex" Rivera, and Anthony Avella.  As to David Luxemburg, the Court finds him liable for breach of fiduciary duty and civil conspiracy, but not liable for misappropriation of trade secrets (neither under the DTSA nor TUTSA), tortious interference with existing contracts, tortious interference with prospective contracts, or fraud.  As for Sarah Luxemburg, the Court finds her liable for knowing participation in David Luxemburg's breach of fiduciary duty and civil conspiracy, but not liable for misappropriation of trade secrets (neither under the DTSA nor TUTSA), tortious interference with existing contracts, or tortious interference with prospective contracts.  Lastly, the Court finds Exodus liable for knowing participation in David Luxemburg's breach of fiduciary duty, but not liable for tortious interference with existing contracts or unjust enrichment.   Oracle is awarded $187,842.16 in compensatory damages for which David Luxemburg, Sarah Luxemburg, and Exodus are jointly and severally liable.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on the  8th  of September, 2021.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE